Not for Publication

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MICHAEL TELZER,<br><br>*Plaintiff,*<br><br>v.<br><br>BOROUGH OF ENGLEWOOD CLIFFS, et al.,<br><br>*Defendants.* | Civil Action No. 13-4306 (JMV)<br><br>**OPINION** |

### John Michael Vazquez, U.S.D.J.

This case arises from the events surrounding Plaintiff's arrest, indictment, and subsequent acquittal on charges of fourth degree lewdness in violation of N.J.S.A. 2C:14-4B(1), and third degree endangering the welfare of a child in violation of N.J.S.A. 2C:24-4B(1). Plaintiff Michael Telzer ("Plaintiff" or "Telzer") brings his suit against Defendants Borough of Englewood Cliffs ("the Borough" or "Englewood Cliffs"), the Englewood Cliffs Police Department (the "ECPD"); Chief of Police Michael Cioffi; Police Officers William Laraia, Gerard McDermott, Daniel Morrissey, David Hill, Ronald Waldt; as well as John and Jane Does and XYZ Corporation (collectively, "Defendants"). Defendants bring two motions: (1) a motion for summary judgment (D.E. 66), and (2) a motion to preclude the expert report and testimony of Plaintiff's expert Timothy J. Hardiman (D.E. 65). The Court reviewed all submissions,[1] and considered the motions without oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the reasons

---

[1] In this Opinion, Plaintiff's First Amended Complaint (D.E. 3) will be referred to as "FAC." Defendants' brief in support of their motion for summary judgment will be referred to as "Defs. SJ Br." (D.E. 66). Plaintiff's brief in opposition (D.E. 71) will be referred to as "Pl. SJ Opp." Defendants' brief filed in reply will be referred to as "Defs. SJ Reply" (D.E. 74).

that follow, Defendants' motion for summary judgment (D.E. 66) is **GRANTED**. Defendants' motion (D.E. 65) to preclude Hardiman is dismissed as moot.

## I. BACKGROUND

The Incident

On the evening of July 14, 2011, Plaintiff was "fast walking" along the track at Witte Field ("the Field") in Englewood Cliffs. D.E. 66-4, Defendants' Statement of Material Facts ("Defs. SOMF") at ¶ 2-3; D.E. 71-2, Plaintiff's Supplemental Statement of Material Facts ("Pl. SOMF") at ¶ 1. Plaintiff wore cargo shorts that had two cargo straps hanging down. Defs. SOMF at ¶ 3. At 8 p.m. the Englewood Cliffs Police Department received a 9-1-1 call routed from the Bergen County Communications Center. Defs. SOMF at ¶ 4. The caller, Nealy Nusbaum Erber ("Erber") told the 9-1-1 operator that she was in "Davis Johnson Park in Englewood Cliffs, there's a man walking around the circle with his self exposed," Pl. SOMF at ¶ 4, and that "I'm here with my kids," *id*. at ¶ 5. Erber was at the park with her six and nine-year-old children.

In response to the call, officers for the Englewood Cliffs Police Department were dispatched. Upon arriving at the park, Officer Waldt approached Plaintiff, who was on the track. The conversation between the two was captured on Waldt's mobile in-car unit video ("MICV"). *Id*. at ¶ 10. Waldt said to Plaintiff: "Excuse me sir. Sir. Come here. I wanna talk to you. Do you have identification on you? Just walking around here? Just walking?" Pl. SOMF at ¶ 10. Plaintiff responded that he was "just doing my workout." Ex. BB (MICV Recording) at 03:37; *see* Pl. SOMF at ¶ 11. The conversation continued:

> Waldt: Alright, listen. We got a report of someone matching your description exposing himself.
>
> Plaintiff: Oh come on. Who said that?
>
> Waldt: I'm not sure who the complaint was –

> Plaintiff: That's the sickest thing I've ever heard.
>
> Waldt: Okay, that's fine, alright. Just lift your shirt up for me just a second, okay. *You see that your zipper's down and your belt's undone.* Come on over here. Come on over here for me, okay.
>
> Plaintiff: This is crazy.
>
> Waldt: Just sit on over on that bench.
>
> Plaintiff: I've been walking the whole time [INAUDIBLE]. *I'm just a sloppy dresser.*

*Id.* at ¶ 12 (emphases added). Plaintiff then asked "are you kidding me?" to which Waldt responded that "this is not something we take lightly, sir." MICV Recording at 04:49. Plaintiff stated that "I don't take it lightly either." *Id.* at 04:50. Plaintiff then asked the officer "is this a nightmare or something?" *Id.* at 04:53. The officer responded: "I assure you this is very real." *Id.* at 04:55.

Around the same time, Officer McDermott separately spoke with Erber at the scene. As McDermott began to speak, Erber stated that "I hope that I'm not crazy." MICV Recording at 20:45-20:51. Erber then described to the Officer a "white male, tall, khaki shorts, and like a white button down shirt." *Id.* at 21:00-21:10. Plaintiff is a white male and Erber accurately described what he was wearing. There is no indication that there were any other persons at the scene who could possibly fit Erber's description.

McDermott then joined Waldt's conversation with Plaintiff. Waldt stated to McDermott: "[Plaintiff's] belt was undone, his zipper was undone." Pl. SOMF at ¶ 12. The conversation between Plaintiff and the Officers continued, in part[2]:

> Officer[3]: You need to fix yourself up bud, *your zipper is down and button was undone.*
>
> Plaintiff: *Well yes it is cause I am a little sloppy of a dresser.*
>
> Officer: Turn around. You certainly are.
>
>            ***
>
> Plaintiff: I was down here this morning too. [INAUDIBLE]. That's the sickest thing I've ever heard. [INAUDIBLE]. That's the sickest thing I've ever heard of.
>
>            ***
>
> Plaintiff: They are fine, let me talk to them. [presumably referring to Erber and her daughters]
>
> McDermott: No, you will not talk to them, you will talk to us.
>
> Plaintiff: This is the craziest thing I have ever heard of.
>
>            ***
>
> McDermott: Well doing that would be the sickest thing I've ever heard of, do you agree?
>
> Plaintiff: Yes. I agree. Absolutely. Beyond a shadow of a doubt. I didn't do that.
>
>            ***

---

[2] The Court has reviewed the multiple overlapping MICV Recordings and, where relevant, supplements and re-orders Plaintiff's transcript included in his SOMF. Defendants have not contested any of Plaintiff's transcriptions.

[3] Plaintiff asserts, and Defendants do not contest, that it is sometimes difficult to decipher which Officer is speaking. When Plaintiff could not determine the identity of the officer, Plaintiff used "Officer." *See* Pl. SOMF ¶ 14 n.2. The Court likewise uses "Officer" when the speaker is not clear.

Waldt: Alright, listen. We are going to bring you in for further investigation ok?

Plaintiff: Is this going to go in the paper that I did something?

Officer: No. Just relax.

Waldt: We need to ask you a few questions, we're going to be bringing you into the headquarters alright?

***

Plaintiff: Sir, I come out here and I exercise. I am not thinking like 100%.

McDermott: Oh you're not thinking that? When I exercise I think 100%. Alright take the other shoe off. Take the other shoe off.

Plaintiff: When I exercise I'm not thinking about anything except getting healthy. Please don't treat me like I'm guilty. You can't believe I am.

***

Plaintiff: I cannot believe this.

McDermott: I have no interest in . . . well you should change your appearance.

Plaintiff: I'm not that careful.

Pl. SOMF at ¶ 14 (emphasis added); MICV Recording.

Shortly thereafter, one officer asked the other if Erber should be brought over to identify Plaintiff. The other officer responded that Plaintiff "fits the description, and as soon as I started to walk up he started walking back that way—that's why I stopped him right away." MICV Recording at 08:48-08:55. Plaintiff was then transported to police headquarters, where he was photographed. *Id.* at 14:30-17:30; D.E. 66-5, Exhibit FF.

While at the park, McDermott searched the area and found a paper towel (or tissue) in a waste basket near the area where Plaintiff was stopped. Pl. SOMF at ¶ 25. McDermott took photos

5

of the towel and then seized it. *Id.* at ¶ 26-27. On July 18, 2011, the paper towel was sent for

testing to the Division of State Police Forensic Science Bureau's Central Region Laboratory in

Hamilton, New Jersey. *Id.* at ¶ 28. The laboratory later determined that the towel tested negative

for semen. *Id.* at ¶ 33. The parties dispute the circumstances surrounding the receipt of the lab

results. Plaintiff claims that the lab results came back on October 17, 2011. *Id.* In a supplemental

filing, Defendants contend that the lab results were mailed on October 26, 2011. D.E. 77 at 2.

Erber's Written Statements to Police

Immediately after, Erber went to the police station and provided police with the following

written statement:

> I Nealy Nusbaum Erber of Booth Avenue, Englewood NJ, 201-541-
> [REDACTED] was walking on the pedestrian loop at Davis Johnson
> Park when I saw a tall white male in greenish/khaki cargo shorts and
> a white shirt walking towards me with himself exposed. It appeared
> to me that his fly was open and his penis was sticking out through
> the fly opening. I do not believe it was the string of his shorts as the
> color appeared to be a pinkish/nude tone. I looked away and called
> 911. The gentleman was walking quickly and what I believe was
> his penis was moving up and down.

The statement was signed by Detective Morrissey. Pl. SOMF at ¶ 48. Morrissey called Erber back

to the police station the next day to correct her statement. Erber had believed that the park was

Davis Johnson when in fact it was Witte Field. Erber re-wrote her entire report and included more

details. *Id.* at ¶ 51. Her second statement read as follows:

> I Nealy Nusbaum Erber of Booth Avenue, Englewood NJ 07631,
> 201-541-[REDACTED], was walking on the pedestrian loop at
> Witte Field Park on Johnson Avenue, in Englewood Cliffs, NJ (I
> thought this was known as David Johnson Park) while my 2
> daughters rode bikes when a tall white male in greenish/beige/khaki
> cargo shorts and a white shirt walked towards me with his penis
> sticking out of his fly. I do not believe that this was a part of his
> shorts of strings [sic] as it appeared to be a nude/pinkish color. He
> was walking at a fast pace with his penis flopping up and down. I
> called 911 and while we waited he did pass us on the loop a second

time. My 9 year old daughter later told me that she thought she saw his private sticking out of his shirt.

When the officers arrived, I described the man who they then spoke to on the pedestrian loop. The man that they questioned was the man that I saw exposed. I saw the officers speaking to him.

*Id.* at ¶ 52.

Police Reports

After arriving at the police station, Waldt wrote an adult arrest report. *Id.* at ¶ 35; D.E. 66-7, Ex. J ("Waldt Arrest Report"). In the report, Waldt recounted that he had received a 9-1-1 call that Nealy Erber was with her two children at Witte Field and that she had "observed a white male with 'himself exposed' walking around the pedestrian walkway." Waldt Arrest Report at 1. Waldt continued that once he arrived at the field, he "observed a disheveled white male party walking the track" who he later identified as Plaintiff. *Id.* at 2. The report indicated that as Waldt approached Plaintiff, Waldt noticed that Plaintiff's fly was down and open. *Id.* Later, the report continued, Waldt asked Plaintiff to lift his shirt and Waldt "noticed that in addition to his fly being down and open, his belt was completely unbuckled." *Id.* Waldt's report stated that Defendant McDermott later found a soiled paper towel in a trashcan. *Id.* The report said that after Erber filled out a statement form, Plaintiff was placed under arrest. *Id.* Plaintiff disputes many aspects of Waldt's report. *See* Pl. SOMF at ¶¶ 36-46.

Defendant Morrissey prepared a Supplemental Arrest Report on July 15, 2011. D.E. 71-4, Ex. 9 ("Morrissey Supp. Arrest Report"). In his report, Morrissey recounted that he spoke to Erber's nine-year-old daughter at the police station. *Id.* Morrissey wrote:

[The daughter] said she had seen a man with 'something' hanging out of his pants. She was asked if maybe she had seen his belt hanging from his pants or his shirt out and she shook her head no. I then said, 'so it wasn't any of those things?' She said 'no.' . . . . Using her hands to show me, she stated that she was a little ahead of

her mother, on her bicycle, when she saw the man coming toward
her and her mother. She then said she saw something hanging out.
When asked again what it was, this time she said she thinks it was
his 'privates.' . . . . [Erber] also stated that the male actor had passed
them twice. After the first time is when she called the police. The
actor then came around a second time past them. At this time she
had pulled her daughters off the track and was awaiting police to
respond. . . . After leaving the police department the previous night,
the victim stated her 9 year old daughter admitted to her that she had
seen the male actors [sic] privates, but she was very embarrassed to
tell this officer.

*Id.*

Chief Cioffi Public Statements

On July 15, 2011, Defendant Cioffi issued a press release addressed to "All News Media"

detailing Plaintiff's arrest. It read as follows:

> Englewood Cliffs Police Department Chief Michael Cioffi
> announced the arrest of Michael Telzer (DOB: 11-22-1956) of
> Englewood Cliffs, New Jersey on charges of Lewdness 2C:14-4N,
> a crime of the Fourth Degree and Endangering Welfare of Children
> 2C:24-4B(1), a crime of the Third Degree.
>
> On July 14, 2011 at approximately 7:55 pm Englewood Cliffs
> received a transfer 9-1-1 call from Bergen County dispatch center of
> a "male party walking around with himself exposed." An adult
> female was on the walking path at Witte Field on Johnson Avenue
> with her two daughters ages nine and six. She along with one of her
> daughters observed this white male exposing himself and called 9-
> 1-1.
>
> Officers Ronald Waldt #133 and Gerard McDermott #126
> responded to the call. Officer Waldt located the actor at Witte Field
> and observed the actor had his pants/shorts unbuttoned, belt buckle
> and zipper opened. The actor was attempting to walk away from
> Officer Waldt. The victim positively identified this subject as the
> actor. Officer's [sic] Waldt and McDermott took Michael Telzer
> into custody. He was placed under arrest and transported to
> Englewood Cliffs Police Headquarters. . . .
>
> All defendants are presumed innocent until proven guilty beyond a
> reasonable doubt.

D.E. 66-7, Ex. U ("Cioffi Press Release").

Cioffi was also interviewed by the local media, resulting in a story published on July 18 in

the Cliffview Pilot. The Cliffview Pilot article stated:

> A woman walking with her two girls in an Englewood Cliffs park just before dark called police from her cellphone and said a man exposed himself to them, and officers found his pants still open when they arrived, said Police Chief Michael Cioffi. *The chief said he found a crucial piece of evidence at the scene. "It was a paper towel in a wastebasket, and it had obviously just been thrown in there," Cioffi told Cliffview Pilot. Cioffi directed an officer to retrieve and bag the evidence. It was then sent to the New Jersey State Police laboratory for DNA testing.* The woman and her two daughters—ages 6 and 9—were on the walking path at Witte Field on Johnson Avenue just before 8 o'clock Friday night when they saw Michael Telzer, the chief said. The startled mom dialed 911 and immediately was connected to the Bergen County Dispatch Center, which patched her right through to Cioffi's department. "He was walking away with his pants unbuttoned and belt buckle and zipper opened, when the Officers [Ronald Waldt and Gerard McDermott] pulled up," the chief told Cliffview Pilot. Michael Telzer, spent nearly four hours in custody before being able to post a bond to cover his $50,000 bail on charges of lewdness and child endangerment.

D.E. 71-4, Exhibit 7 (emphasis added) ("Cliffview Pilot Article").

Criminal Charges and Trial

On July 14, 2011, the Honorable Marc C. Saperstein, J.M.C., found probable cause to

charge Plaintiff with violations of N.J.S.A. 2C:14-4(b), fourth degree lewdness, and N.J.S.A.

2C:24-4(a)(1)(i), third degree endangering the welfare of a child. Pl. SOMF at ¶ 65. The

Complaint stated that "[p]robable cause for [Officer Waldt's] belief is set forth in the police report

marked exhibit A." *Id.* at ¶ 66. The referenced report was Waldt's adult arrest report discussed

above. On October 26, 2011, Plaintiff was indicted by the Bergen County Grand Jury for both the

lewdness and endangering charges. *Id.* at ¶ 34; D.E. 66-7, Ex. W. Officer Waldt testified before

the grand jury. Plaintiff disputes the accuracy of Officer Waldt's testimony before the grand jury,

including Waldt's testimony that Erber was "confident" that she saw Plaintiff's penis exposed, that Erber returned to the police station on July 15 to further clarify her initial report, and that Waldt was unaware of the laboratory testing results at the time of his testimony. Pl. SOMF ¶ 126, ¶ 127.

The Honorable James J. Guida, J.S.C., presided over a short jury trial, and on July 13, 2012, the jury acquitted Plaintiff on both counts. Pl. SJ. Opp. at 1; Defs. SJ Br. at 4.

## II. PROCEDURAL HISTORY

Plaintiff filed his initial Complaint on July 12, 2013. D.E. 1. He then filed his First Amended Complaint on July 16, 2013. D.E. 3. At the time, Plaintiff was proceeding *pro se*. Since then, Plaintiff retained counsel but counsel never moved to amend the FAC.

The FAC set forth ten counts: (1) false arrest, (2) false imprisonment, (3) witness tampering, (4) evidence tampering, (5) withholding evidence in violation of *Brady*, (6) violations of Due Process under the Fifth Amendment, (7) violations of Equal Protection under the Fourteenth Amendment, (8) violations of Equal Protection under the Fifth Amendment, (9) supervisory liability based on failure to train against Englewood Cliffs, and (10) supervisory liability against Defendant Cioffi.[4] Although not clear to the Court, Defendants concede that Plaintiff alleges malicious prosecution as part of his allegations in Counts One and Two, so the Court will consider such claims.[5]

---

[4] The Court notes that Plaintiff's FAC is sometimes unclear as to the legal basis for its claims. Plaintiff characterizes the FAC's claims in his Opposition consistent with recitation above. Defendants do not dispute this characterization of Plaintiff's claims. The Court therefore accepts this formulation of the counts.

[5] In fact, Defendants argue against Plaintiff's claim of "defamation," while at the same time recognizing that Plaintiff does not actually make such a claim. Defs. SJ Br. at 43-45. The FAC does not allege defamation, and the Court will not address non-existent causes of action. In addition, Defendants also repeatedly confuse the plausibility standard in a motion to dismiss with the genuine issue of material fact standard in a motion of summary judgment. The Court does

On December 11, 2013, Defendants submitted their Answer. D.E. 6. On March 17, 2017, Defendants filed the instant motions. D.E. 65, 66.

### III.  SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.*  "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).  In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts

---

not consider the motion to dismiss standard in resolving the current motion for summary judgment.

showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

## IV. ANALYSIS

### a. Counts Three, Four, Six, Seven, and Eight

Defendants move for summary judgment on Counts Three (witness tampering), Four (evidence tampering), Six (Fifth Amendment Due Process), Seven (Fourteenth Amendment Equal Protection), and Eight (Fifth Amendment Equal Protection) without any opposition by Plaintiff. Even though Plaintiff fails to oppose the dismissal of the counts, the Third Circuit has cautioned that "the movant for summary judgment has the burden of demonstrating the absence of genuine issues of material fact . . . and even if the opposing party fails to file contravening affidavits or other evidence, summary judgment must still be 'appropriate' and will be denied where the movant's own papers demonstrate the existence of material factual issues." *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 790 (3d Cir. 1978) (internal citations omitted).

In regards to Counts Three (witness tampering) and Four (evidence tampering), Defendants submit that Plaintiff filed these counts under New Jersey Criminal Law, specifically N.J.S.A.

2C:28-5(a) and N.J.S.A. 2C:28-6. Defs. SJ Br. at 18-25. Plaintiff does not contest this assertion or raise any genuine issue of material fact. Obviously this case is a civil action. If Plaintiff believed that Defendants engaged in criminal conduct, Plaintiff should have filed either a citizen's complaint or reported the conduct to the relevant authorities. Therefore, Counts Three and Four are dismissed. To the extent that Plaintiff relies on allegations of witness and evidence tampering to support other claims, the Court will address the allegations in its analysis of those counts.

Counts Six (Fifth Amendment Due Process), Seven (Fourteenth Amendment Equal Protection), and Eight (Fifth Amendment Equal Protection) are likewise dismissed. Defendants have established that there is an absence of a genuine issue of material fact and that they are entitled to summary judgment on those counts.[6]

Accordingly, Counts Three, Four, Six, Seven, and Eight are dismissed. Remaining are Counts One (false arrest and malicious prosecution), Two (false imprisonment and malicious prosecution), Five (withholding evidence in violation of *Brady*), Nine (*Monell* claims against the Borough), and Ten (supervisory liability against Defendant Cioffi). Plaintiff does not explicitly stylize any of the counts as state law claims. However, Defendants concede that Plaintiff brings "both Fourth Amendment civil rights claims under federal law and New Jersey state common law claims for false arrest, false imprisonment and malicious prosecution[.]" Def. SJ Br. at 7. Accordingly, the Court will examine Plaintiff's false arrest, false imprisonment, and malicious prosecution claims under both 42 U.S.C. § 1983 and New Jersey law.

---

[6] Moreover, Count Six brings an action based solely on the Fifth Amendment. The Fifth Amendment's protections apply to the federal government and are applied to the states by way of the Fourteenth Amendment. *See, e.g., Malloy v. Hogan*, 378 U.S. 1, 6 (1964). Defendants here are not federal actors. Therefore, to the extent that Count Six asserts a claim solely based on the Fifth Amendment, it is also dismissed because the Fifth Amendment alone does not apply to Defendants.

### b. Count One and Count Two

Counts One and Two bring claims for false arrest, false imprisonment, and malicious prosecution. As noted, the Court considers the claims pursuant to both federal and state law. Because Plaintiff's FAC is unclear and because Defendants concede that Plaintiff brings Counts One and Two under federal law and "state common law," the Court will, out of an abundance of caution, examine Plaintiff's claims under Section 1983, the New Jersey Civil Rights Act (NJCRA), and New Jersey common law.

#### i. Criminal Statutes at Issue

Plaintiff's claims in Counts One and Two are directly related to Plaintiff's detention, arrest, and prosecution under two New Jersey criminal statutes: N.J.S.A. 2C:14-4(b)(1), fourth degree lewdness; and N.J.S.A. 2C:24-4(a)(1)(i), third degree endangering the welfare of a child. N.J.S.A. 2C:14-4(b)(1) provides as follows:

> (a) A person commits a disorderly persons offense if he does any flagrantly lewd and offensive act which he knows or reasonably expects is likely to be observed by other nonconsenting persons who would be affronted or alarmed.

> (b) A person commits a crime of the fourth degree if:

>> (1) He exposes his intimate parts for the purpose of arousing or gratifying the sexual desire of the actor or of any other person under circumstances where the actor knows or reasonably expects he is likely to be observed by a child who is less than 13 years of age where the actor is at least four years older than the child.

As to lewdness, the New Jersey Supreme Court has indicated that

> [f]ourth-degree lewdness consists of an actor intentionally "exposing" or displaying himself or herself for sexual arousal or gratification under circumstances in which the actor "knows or reasonably expects" that he or she is likely to be observed by a child less than thirteen years old. Thus, *lewdness is limited to exposing*

> *or displaying an actor's intimate parts rather than touching them.*
> For example, a "flasher" or "streaker" may expose the genitals
> without touching them.

*State v. Zeidell*, 154 N.J. 417, 430–31 (N.J. 1998) (emphasis added) (internal citation omitted).

Lewdness stands in contrast to second degree tender years sexual assault, N.J.S.A. 2C:14-2b,

which requires "the actor [to] 'intentionally' touch[] his or her intimate parts . . . for arousal or

sexual gratification 'in view' of an underage child whom the actor 'knows' to be present." *Id*. at

431. The Court also described the actor's required mental state toward the underage child: "The

non-contact lewdness offense requires the actor to expose or display himself or herself "know[ing]

or reasonably expect[ing]" that an underage child will observe the conduct. Under the Code, this

*mens rea* equates with the actor knowing or intending that a child view him or her." *Id*. at 431.

This is, in part, because "[m]ere exposure . . . can be a more ambiguous form of conduct. It is not

inherently or obviously gratifying to expose the genitals; rather, gratification comes only from *the*

*subjective belief by the actor that he or she is being viewed*." *Id*. at 432 (emphasis added).

N.J.S.A. 2C:24-4(a)(1)(i), in turn, provides in pertinent part as follows:

> (a) (1) Any person having a legal duty for the care of a child or who
> has assumed responsibility for the care of a child who engages in
> sexual conduct which would impair or debauch the morals of the
> child is guilty of a crime of the second degree. Any other person
> who engages in conduct or who causes harm as described in this
> paragraph to a child is guilty of a crime of the third degree.

> (b) (1) As used in this subsection:

>> "Prohibited sexual act" means
>> . . .
>> (i) Nudity, if depicted for the purpose of sexual
>> stimulation or gratification of any person who may
>> view such depiction.

Comparing the two statutes, the Supreme Court of New Jersey stated:

> The same nudity that may constitute the fourth-degree offense of
> lewdness can additionally form the basis for the third-degree offense
> of endangering the welfare of children if such nudity "would impair
> or debauch the morals" of a child under the age of sixteen. . . . Thus,
> the focus in a prosecution for endangering the welfare of children
> shifts from the mental state of the actor in performing the lewd
> conduct to the potential effect that such conduct may have on the
> morals of the child or children who are witness to the conduct.
>
> . . .
>
> [A] conviction for fourth-degree lewdness should not automatically
> sustain a third-degree endangering conviction. To sustain such a
> conviction, there must be proof that the nudity went beyond mere
> exposure and "would impair or debauch the morals" of the children
> subjected to such conduct.

*State v. Hackett*, 166 N.J. 66, 76 (N.J. 2001). The Supreme Court noted that "both statutes were

amended by the Legislature as part of an effort to increase penalties for sexual crimes committed

against minors." *Id*. at 77.

In *Hackett*, the Court further ruled as follows:

> Proof of actual impairing or debauching of the victims['] morals is
> not required. The legislative language prohibits any sexual conduct
> that would result in the impairing or debauching of an average child
> in the community. The word "would" signals the futurity of a likely
> event; it does not require the event's actual occurrence.

*Id*. at 80. The *Hackett* Court made clear that the determination of whether such conduct would

impair or debauch the morals of a child in the community "is well within the abilities of the average

jury, and allows the jury to fulfill its role as arbiter of community standards when applying the

laws of our State. *Id*. at 83. For example, in *Hackett*, the Court found that a jury reasonably found

a defendant guilty of third degree endangering the welfare of a child when, among other things,

"there was testimony of repeated instances when the defendant allowed himself to be viewed

naked, through an unobstructed window, by girls who were age thirteen and under." *Id*. at 81.

### ii. Section 1983 and NJCRA Claims

Plaintiff brings Counts One and Two pursuant to Section 1983, and the Court also assumes

Plaintiff brings them under the New Jersey Civil Rights Act ("NJCRA").[7]

42 U.S.C. § 1983, in relevant part, provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not provide substantive rights; rather, Section 1983 provides a vehicle

for vindicating violations of other federal rights. *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

In order to state a claim under Section 1983, a plaintiff must demonstrate that "(1) a person

---

[7] The Court notes that it assumes that Plaintiff brings his claims against Defendants in their individual capacities. To the extent that Plaintiff brings his claims against the individual Defendants in their official capacities, these claims are dismissed as a matter of law. *Baker v. Camarillo*, 2018 WL 1203473, at *3 (D.N.J. Mar. 8, 2018) ("As with § 1983, New Jersey state courts have held that the State, its agencies, and state officials in their official capacities are not 'persons' within the meaning of the NJCRA and are immune from suit." (citing *Brown v. State*, 124 A.3d 243, 255-56 (N.J. Super. Ct. App. Div. 2015)).

Plaintiff also brings claims against the Englewood Cliffs Police Department, as well as against the Borough of Englewood Cliffs. Defendants argue that the police department cannot be sued separately from the municipality in a Section 1983 case. Plaintiff provides no contrary argument. "In Section 1983 actions, police departments cannot be sued in conjunction with municipalities, because the police department is merely an administrative arm of the local municipality, and is not a separate judicial entity." *Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004) (emphasis added) (internal quotation omitted); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 (3d Cir. 1997) ("[W]e treat the municipality and its police department as a single entity for purposes of section 1983 liability."); *Adams v. City of Camden*, 461 F. Supp. 2d 263, 266 (D.N.J. 2006) (finding that "[i]n New Jersey a municipal police department is not an entity separate from the municipality; therefore, the Camden Police Department is not a proper defendant in this action." (internal citation omitted)). Plaintiff's Section 1983 claims against the Englewood Cliffs Police Department are dismissed as duplicative of its claims against the Borough.

deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Burt v. CFG Health Sys.*, No. 15-2279, 2015 WL 1646849, at *2 (D.N.J. Apr. 14, 2015).

Although Plaintiff does not refer to the NJCRA in his FAC, the Court will nevertheless analyze his claims under the statute because, as discussed, Defendants concede the point in their briefing. The NJCRA provides a private cause of action to

> [a]ny person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J.S.A. 10:6-2. The "NJCRA was modeled after § 1983, [and so] courts in New Jersey have consistently looked at claims under the NJCRA through the lens of § 1983 and have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart." *Velez v. Fuentes*, No. No. 15-6939, 2016 WL 4107689, at *5 (D.N.J. July 29, 2016) (internal quotations and citation omitted); *see, e.g.*, *Waselik v. Twp. of Sparta*, No. 16-4969, 2017 WL 2213148, at *8 n.15 (D.N.J. May 18, 2017) (noting that the court had "not seen in the case law any indication that malicious prosecution is an exception to the general principle that NJCRA is construed in parallel to § 1983."). Therefore, the Court considers Plaintiff's Section 1983 and NJCRA claims together.

### 1. Elements of False Arrest, False Imprisonment, and Malicious Prosecution Under Federal and State Law

False arrest and false imprisonment are very similar and are often considered together. To state a claim for false arrest under federal or New Jersey law, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause. *See James v. City of*

*Wilkes–Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (describing false arrest under the Fourth Amendment); *Schirmer v. Penkethman*, No. CIV. 10-1444, 2012 WL 6738757, at *8 (D.N.J. Dec. 31, 2012) (citations omitted) (describing false arrest under New Jersey law), *aff'd*, 553 F. App'x 268 (3d Cir. 2014). "The proper inquiry in a section 1983 claim based on false arrest . . . is not whether the person arrested in fact committed the offense but whether the arresting officers had probable cause to believe the person arrested had committed the offense." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995) (quoting *Dowling v. City of Phila.*, 855 F.2d 136, 141 (3d Cir. 1988)); *Nanton v. Mecka*, No. 11-6132, 2013 WL 1844756, at *6 (D.N.J. Apr. 30, 2013) ("The validity of an arrest does not depend on the ultimate finding of guilt or innocence following an arrest.").

In addition, "where the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." *O'Connor v. City of Philadelphia*, 233 F. App'x 161, 164 (3d Cir. 2007) (citations omitted); *see Reedy v. Twp. of Cranberry*, No. 06-1080, 2007 WL 2318084, at *3 (W.D. Pa. Aug. 9, 2007) ("The basis for false arrest is the arrest itself, whereas the basis for false imprisonment is the detention that follows the false arrest.") Under New Jersey law, "[t]he tort of false imprisonment has two elements: (1) an arrest or detention of the person against his or her will and (2) lack of proper legal authority or legal justification." *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 591 (N.J. 2009) (quotations omitted). In other words, in New Jersey, "[f]alse imprisonment is the constraint of the person without legal justification." *Id.*

Under both federal and New Jersey law, the absence of probable cause is also a required element of a malicious prosecution claim. *McKenna v. City of Philadelphia*, 582 F.3d 447, 461 (3d Cir. 2009) (describing federal requirements); *Schirmer*, 2012 WL 6738757, at *8 (describing

New Jersey requirements). To succeed on a malicious prosecution claim under federal law, a plaintiff must show:

> (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.

*Halsey v. Pfeiffer*, 750 F.3d 273, 296–97 (3d Cir. 2014) (citing *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007)). Under New Jersey law, malicious prosecution requires "'(1) that the criminal action was instituted by the defendant against the plaintiff, (2) that it was actuated by malice, (3) that there was an absence of probable cause for the proceeding, and (4) that it was terminated favorably to the plaintiff.'" *Stolinski v. Pennypacker*, 772 F. Supp. 2d 626, 636–37 (D.N.J. 2011) (quoting *Epperson v. Wal–Mart Stores, Inc.*, 373 N.J.Super. 522, 530 (App. Div. 2004)). "A plaintiff must also show that the conduct constituting institution of the action was the proximate cause of the charges being brought (i.e., the chain of causation was not interrupted by an intervening agent)." *Stolinski*, 772 F. Supp. 2d at 637.

### 2. Qualified Immunity

Defendants argue that they are entitled to qualified immunity. Qualified immunity can shield a municipal officer from liability in a Section 1983 case. *Wright v. City of Philadelphia*, 409 F.3d 595, 599 (3d Cir. 2005). "Qualified immunity shields government officials from personal liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Paszkowski v. Roxbury Twp. Police Dep't*, No. 13-7088, 2014 WL 346548, at *2 (D.N.J. Jan. 30, 2014). A court must engage in a two-part inquiry to determine whether qualified immunity applies: (1) whether the

allegations, taken in the light most favorable to the party asserting the injury, show that defendant's conduct violated a constitutional right, and (2) whether the constitutional right at issue was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Courts have the discretion to consider either prong of the two-part analysis first. *Id*. at 236. The United States Supreme Court has ruled that the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). "To make that determination, [a court should] engage in another reasonableness inquiry: 'whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Santini v. Fuentes*, 795 F.3d 410, 417–18 (3d Cir. 2015) (quoting *Saucier*, 533 U.S. at 202). This analysis is "undertaken in light of the specific context of the case." *Saucier*, 533 U.S. at 201.

"The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009). In deciding qualified immunity questions at summary judgment, a court must view the facts in the light most favorable to the plaintiff. *Id*.; *see Scott v. Harris*, 550 U.S. 372, 378 (2007) (finding that when the parties' versions of the facts differ substantially at summary judgment, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion," and therefore, in "qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." (internal quotations, citations, and brackets omitted)). Summary judgment may be granted to officers if, when interpreting the facts in the light most favorable to the plaintiff, the court determines that the facts do not support a violation of a clearly established constitutional right. *Mitchell v. Forsyth*, 472 U.S. 511, 546 (1985) (stating that "when a trial court renders a qualified

immunity decision on a summary judgment motion, it must make a legal determination very similar to the legal determination it must make on a summary judgment motion on the merits"); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014); *Scott*, 550 U.S. at 378.

Qualified immunity under New Jersey law "tracks the federal standard." *Brown v. State*, 230 N.J. 84, 98 (N.J. 2017) ("To ascertain whether a governmental official . . . is entitled to qualified immunity requires inquiries into whether: (1) the facts, taken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional right; and (2) that constitutional right was clearly established at the time that defendant acted." (quotations, citations, and brackets omitted)). The qualified immunity defense "extends to suits brought under . . . the [NJCRA]." *Id*. Accordingly, the Court considers qualified immunity under federal or state law together.

In regards to the first step of the qualified immunity analysis, it is undisputed that the right to be free from arrest except on probable cause was clearly established at the time of Plaintiff's arrest. *Orsatti*, 71 F.3d at 482 (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 169 (1972)). The same is true of false imprisonment, *Groman*, 47 F.3d at 636, and malicious prosecution, *Torres v. McLaughlin*, 163 F.3d 169, 183 (3d Cir. 1998).

The Court now moves to the second step of the analysis: whether there has been a violation of a clearly established constitutional right. As noted, false arrest, false imprisonment, and malicious prosecution all require a plaintiff to show a lack of probable cause. *Berry v. Kabacinski*, 704 F. App'x 71, 73 (3d Cir. 2017). "The standard for probable cause is identical under federal and New Jersey law." *Schirmer v. Penkethman*, No. 10-1444, 2012 WL 6738757, at *8 (D.N.J. Dec. 31, 2012), *aff'd*, 553 F. App'x 268 (3d Cir. 2014). "Probable cause exists if there is a 'fair probability' that the person committed the crime at issue." *Wilson v. Russo*, 212 F.3d 781, 789 (3d

Cir. 2000). Specifically, "[p]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 788 (3d Cir. 2000) (quoting *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir.1995)). The New Jersey Supreme Court has described probable cause as "less than legal evidence necessary to convict though more than mere naked suspicion." *State v. Wilson*, 178 N.J. 7, 13 (N.J. 2003). "Probable cause exists [under New Jersey law] if at the time of the police action there is a well grounded suspicion that a crime has been or is being committed." *Id.*

"A police officer may be liable for civil damages for an arrest if 'no reasonable competent officer' would conclude that probable cause exists." *Wilson*, 212 F.3d at 789–90 (3d Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Generally, the question of probable cause in a section 1983 damage suit is one for the jury. . . . particularly [ ] where the probable cause determination rests on credibility conflicts." *Merkle*, 211 F.3d at 788 (internal quotations and citations omitted). "However, a district court may conclude that probable cause exists as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding, and may enter summary judgment accordingly." *Id.* at 788–89 (quotation omitted).

Plaintiff argues that genuine issues of material fact exist as to whether Defendants had probable cause to arrest and charge Plaintiff. Pl. SJ Opp. at 47-54. Plaintiff first asserts that Defendants lacked probable cause to detain and arrest him at Witte Field.[8] In support of this assertion, Plaintiff claims the following: there was no evidence of his sexual arousal or

---

[8] Plaintiff claims that he was arrested at Witte Field, Pl. SJ Opp. at 47, and Defendants' position on the issue is not clear. The Court assumes, for the basis of this motion, that Plaintiff was detained and arrested at Witte Field.

gratification, no mention of Erber's children, Erber questioned her own sanity, Plaintiff provided a viable explanation, and there was no other corroborating witness. Plaintiff next argues that the municipal judge who signed the complaint did not have probable cause because Waldt made false statements in his adult arrest report. The alleged false statements concern Plaintiff's appearance, Erber being "confident" that Plaintiff exposed himself, and a reference to the paper towel. Plaintiff concludes that as the investigation continued, any cause "evaporated" because of the laboratory results on the paper towel, evidence tampering as to Plaintiff's photographs, and Defendants' withholding of the MICV recordings.

Here, the Court finds that there is no genuine issue of material fact and that Defendants had probable cause to arrest and charge Plaintiff with lewdness and endangering the welfare of a child. Accordingly, Defendants are entitled to qualified immunity and are granted summary judgment on Plaintiff's Section 1983 and NJCRA claims in Counts One and Two. Erber's 9-1-1 call and subsequent statements to Officers at the scene provided specific allegations that Defendant had exposed himself while walking on the track. Erber told the 9-1-1 operator that she was in "David Johnson Park in Englewood Cliffs, there's a man walking around the circle with his self exposed," Pl. SOMF ¶ 4, and that "I'm here with my kids," *id*. at ¶ 5. When the officers arrived, they encountered Plaintiff (and there is no indication in the record that there was another person present who matched his description). The officers also found Erber and her two minor children, as Erber indicated on the emergency call. At the scene, Erber's description of a "white male, tall, khaki shorts, and like a white button down shirt," MICV Recording at 21:00-21:10, matched Plaintiff's appearance.

When Officer Waldt approached Plaintiff, Waldt observed Plaintiff's zipper down. After asking Plaintiff to lift his shirt, the officer also noticed that Plaintiff's belt was unbuckled. On the

audio recording, Plaintiff did not deny that either his belt was unbuckled or that his zipper was down. Instead, Plaintiff claimed that he was merely a "sloppy dresser," an explanation that the officers reasonably found unconvincing. While sloppiness may explain why a person's shirt is untucked, his clothes are wrinkled, or his clothes do not match, it does not explain why Plaintiff's zipper was down and his belt was unbuckled. Critically, Plaintiff's open zipper and unbuckled belt were consistent with him exposing himself as he walked near Erber and her children. All of these facts and circumstances provided officers with sufficient information to have probable cause that Defendant had violated both N.J.S.A. 2C:14-4B(1) and N.J.S.A. 2C:24-4B(1).

After the events at the field, Erber went to the police station and gave a definitive statement, which she then replaced with another definitive statement while explaining that she initially thought she was at a park other than Witte Field. In the second statement, Erber also noted that her nine-year-old daughter had indicated that she (the child) had seen Plaintiff exposed. Similarly, Morrissey's supplemental report reflects that the child thought that she had seen Plaintiff's "privates."

As noted, Plaintiff makes many arguments against probable cause. However, Plaintiff's arguments are not persuasive. For example, Plaintiff contends that in her 9-1-1 call, Erber may have believed that Plaintiff's exposure was "accidental" or because he was "in some sort of distress that would require medical attention." Pl. SJ Opp. at 5-6. This argument cannot even be generously characterized as speculative because Plaintiff himself contradicts these contentions – he does not claim to have accidentally exposed himself or that he was in distress. As to Waldt's police report, which was relied upon by Judge Saperstein, the Court disagrees with Plaintiff's arguments. For example, Plaintiff argues that the report improperly characterized him as "disheveled," but Plaintiff freely admitted at the scene that he was a sloppy dresser by way of

defense. The Court does not comprehend how Plaintiff can take issue with a characterization that he himself promulgated. In addition, even if the Court were to excise the word "confident" from the description of Erber's identification, the report nevertheless sufficiently sets forth probable cause on which Judge Saperstein could rely.

Plaintiff also repeatedly argues that the officers coerced Erber and her daughter to lie. But there is no evidence to support such a contention. In her deposition, Erber said the exact opposite; that is, no officer pressured her to change her allegations in any way. Likewise, Plaintiff claims that Defendants failed to give the MICV recordings to the county prosecutor. However, Defendants' evidence reflects that they did in fact provide copies of the recordings to the prosecutor on two occasions. D.E. 66-7, Ex. T, Sgt. T. Coletta Reports (stating that two copies of the MICV recordings were provided to the Bergen County Prosecutor's Office on January 2, 2012 and on February 24, 2012). Plaintiff's argument appears to be based on a hearsay statement of the trial prosecutor that she was unaware of the recordings. Yet, plaintiff did not depose the trial prosecutor in this case nor did he produce credible evidence to create a genuine issue of material fact that Defendants intentionally failed to disclose any information to the county prosecutor. To the extent that Erber's statements on the MICV recordings can be argued to cast doubt on her identification, they were not sufficient to eradicate probable cause (and Plaintiff was able to make use of them at trial, as discussed below) in light of her 9-1-1 call and her identification of Plaintiff at the scene. In addition, while Plaintiff asserts that the copies of the photographs that he was given in discovery were darker than they should have been, there is no evidence of any tampering with the photographs by Defendants. Similarly, there is no indication that Plaintiff was denied the right to inspect the original photographs.

Plaintiff also contends that Officer Waldt lied during his grand jury testimony and that the indictment was "unconstitutionally obtained based upon these contradictory and misleading statements." Pl. SJ Opp. at 38-39. However, Waldt is entitled to absolute immunity as to his grand jury testimony. *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012) (holding that "a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony"). Beyond absolute immunity, Plaintiff's analysis of Waldt's grand jury testimony is flawed. For example, Plaintiff claims that Waldt intentionally lied when he told the grand jury that he did not believe that the laboratory results concerning the paper towel were available. Based on Defendants' supplemental information, it appears that Waldt's testimony was accurate; the laboratory had not yet mailed the test results as of the day of Waldt's grand jury appearance. *See* D.E. 77.

Plaintiff further asserts that Defendants did not have probable cause that Plaintiff exposed himself *to a minor for the purposes of sexual gratification* as required by N.J.S.A. 2C:14–4b(1). Pl. SJ Opp. at 47-49. Plaintiff argues that at the time of his arrest, "there is not a single shred of evidence that Plaintiff had exposed himself to Erber's children for the purposes of sexual arousal or desire." Pl. SJ Opp. at 48. However, Erber's evidence indicated that Plaintiff passed her and her children twice with his penis exposed. Plaintiff argues that he did not have an erection nor was he masturbating, but neither is required for either offense. In fact, the defendant in *Hackett* was merely standing in front of an open window while naked; there was no evidence of an erection or masturbation. *Hackett*, 166 N.J. at 71-72 (internal citations omitted). In fact, as the New Jersey Supreme Court in *Hackett* observed, if Plaintiff had been masturbating in view of the two minor children, he could have been charged with second degree tender years assault.

Plaintiff also argues that there is no proof that Erber's daughter actually saw his exposed penis. Pl. SJ Br. at 48-49. However, N.J.S.A 2C:14–4b(1) only requires that an actor intentionally

27

expose himself for sexual arousal or gratification "under circumstances which the actor 'knows or reasonably expects' that he . . . is likely to be observed by a child less than thirteen years old." *Zeidell*, 154 N.J. 430 (citing N.J.S.A 2C:14–4b(1)). Contrary to Plaintiff's assertions, there is evidence that Erber's nine-year-old daughter did see Plaintiff expose himself. But even if Erber's daughter did not see Plaintiff's exposure, the officers had probable cause to believe that Plaintiff "reasonably expect[ed]" that it was likely that the children would see him expose himself at Witte Field, a public park where Erber's two children were riding their bikes.

As to malicious prosecution, in addition to his probable cause arguments, Plaintiff adds that Chief Cioffi acted with an improper purpose in charging Plaintiff because Cioffi wanted to increase the size of the police force. Plaintiff also has presented evidence that the chief had argued for more officers due to issues with sick time, overtime, and traffic duty. Plaintiff, however, has presented no evidence that the police department was able to increase the size of its force based on his arrest, or that Cioffi believed that he could do so.

Because Defendants had probable cause as a matter of law to detain, arrest, and prosecute Plaintiff, they are entitled to qualified immunity under federal and state law. Defendants are likewise entitled to summary judgment on Plaintiff's Section 1983 and NJRRA claims for false arrest, false imprisonment, and malicious prosecution claims.

### iii. New Jersey Common Law Claims

Additionally, Defendants are entitled to summary judgment on any state common law claims for false arrest, false imprisonment, and malicious prosecution because there are no genuine issues of material fact as to Defendants' probable cause.[9] As noted, New Jersey common law tort

---

[9] Under New Jersey law, the Tort Claims Act, N.J.S.A. 59:1-1 *et seq.*, governs tort actions against public entities. There are a number of statutory immunity provisions under New Jersey law that shield individuals and entities from potential liability under the NJTCA, and Defendants

claims for false arrest, false imprisonment, and malicious prosecution all require a showing of probable cause. *Mesgleski v. Oraboni*, 330 N.J. Super. 10, 25 (App. Div. 2000) ("A plaintiff need not prove the lack of probable cause, but the existence of probable cause will nevertheless defeat [a false arrest or false imprisonment] action."); *LoBiondo v. Schwartz*, 199 N.J. 62, 90 (N.J. 2009) (Observing that malicious prosecution under New Jersey law requires a plaintiff to demonstrate that "there was an absence of probable cause to prosecute" (citation omitted)). Accordingly, Defendants are granted summary judgment on Plaintiff's state law tort claims.

### c. Count Five (*Brady* Claims)

Plaintiff's Count Five, brought pursuant to Section 1983, alleges that Defendants violated *Brady* by withholding evidence, including clearer photographs, MICV recordings, and forensic test results. In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). A *Brady* claim raises due process concerns. *See Gagliardi v. Fisher*, 513 F. Supp. 2d 457, 489 (W.D. Pa. 2007). "A *Brady* [due

---

appear to argue that every provision bars Plaintiff's state law claims. Defs. SJ Br. at 49-56. The Defendants' brief essentially cites the relevant statutory provisions, string cites certain cases, and then in conclusory fashion, avers that they are entitled to immunity. When Defendants do engage in a substantive analysis, they are unconvincing. For example, Defendants claim that "the Defendant Officers are vested with discretion as to how to proceed in *any* particular situation. This would include whether to arrest Plaintiff." Def. SJ Br. at 54 (emphasis added). As a result, Defendants conclude, that "[i]t cannot be questioned" that the individual officers have discretionary immunity regarding their arrest of Plaintiff. *Id.* at 54-55. Thus, it appears that Defendants are arguing that they have unfettered discretion to do whatever they want, whenever they want, as police officers. The Court assumes that this means making arrests without probable cause. Defendants provide no support for their unreasonably broad reading of discretionary immunity, nor could the Court find any supporting authority. Therefore, the Defendants' state immunity arguments fail, but they nevertheless prevail because there is no genuine issue of material fact precluding summary judgment.

process] violation occurs if: (1) the evidence at issue is favorable to the accused, because either exculpatory or impeaching; (2) the prosecution withheld it; and (3) the defendant was prejudiced because the evidence was 'material.'" *Breakiron v. Horn*, 642 F.3d 126, 133 (3d Cir. 2011). "This is an objective test, meaning that no bad-faith inquiry is required." *United States v. Risha*, 445 F.3d 298, 303 (3d Cir. 2006). "It is well-settled that the prosecution has a duty to learn of and disclose information known to the others acting on the government's behalf in the case." *United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008) (internal quotation omitted). "Accordingly, it has been held that a state prosecutor has a duty to obtain and turn over to the defense favorable evidence known to a state police officer who investigated the case." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).

"Under *Brady*, evidence is material if there is a reasonable probability that, if the evidence had been disclosed, the result of the proceeding would have been different." *Breakiron*, 642 F.3d at 133–34 (internal quotations and brackets omitted). The Third Circuit has delineated the parameters of materiality:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.

*Id.* at 134 (internal citations, quotation marks, and brackets omitted).

Here, Plaintiff brings his claims against police officers rather than members of the prosecutor's office. Defendants argue that "[i]n the instant matter, the duty of *Brady* disclosure was solely on the Prosecutor from the BCPO[, Bergen County Prosecutor's Office,] (and not upon the police department)." Def. SJ Brief at 20. Defendants provide no legal support for their position. Plaintiff also provides no argument in response. In *Gibson v. Superintendent of NJ Dep't*

*of Law & Pub. Safety-Div. of State Police*, 411 F.3d 427 (3d Cir. 2005), *overruled on other grounds by Dique v. N.J. State Police*, 603 F.3d 181 (3d Cir. 2010), the Third Circuit held that "police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor." *Id.* at 443; *see also Yarris v. Cty. of Delaware*, 465 F.3d 129, 141 (3d Cir. 2006) (finding that "police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor"). The *Gibson* court reasoned that "[a]lthough Brady places the ultimate duty of disclosure on the prosecutor, it would be anomalous to say that police officers are not liable when they affirmatively conceal material evidence from the prosecutor." *Gibson*, 411 F.3d at 443. "Thus, the Third Circuit joined numerous other circuits in recognizing that a plaintiff states an actionable § 1983 claim against police officers for interference with his Fourteenth Amendment rights by alleging that the police officers failed to disclose material exculpatory information to the prosecutor." *Nanton v. Mecka*, No. 11-6132, 2013 WL 1844756, at *9 (D.N.J. Apr. 30, 2013). Accordingly, police officers may be liable for a *Brady* violation if the facts warrant such a finding.

Plaintiff alleges the following *Brady* violations: (1) Plaintiff was only provided darkened processing photos until after jury selection, when he was provided clearer pictures, Pl. SJ Opp. at 34-35; (2) officers were instructed to make copies of the MICV and provide the videos to the prosecutor and Plaintiff's attorney, but that they were only made aware of the videos in March 2012, Pl. SJ Opp. at 35; and (3) the police department failed to disclose to defense counsel the test results of the paper towel, Pl. SJ Opp. at 36. [10] In sum, Plaintiff alleges that "Defendants engaged

---

[10] As noted, Plaintiff makes the same arguments concerning probable cause. In an abundance of caution, the Court also addresses the arguments as to the *Brady* claim.

in an orchestrated scheme to withhold evidence from Plaintiff's defense attorney." Pl. SJ Opp. at 36.

However, Plaintiff fails to show how the alleged withholding of this evidence affected the result of Plaintiff's criminal trial, which resulted in an acquittal of all charges. The Third Circuit has importantly noted the limits of *Brady*, stating:

> Even though this duty of disclosure is tightly tethered to constitutional guarantees of due process, the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense. Rather, *the prosecution's failure to disclose evidence rises to the level of a due process violation only if the government's evidentiary suppression undermines confidence in the outcome of the trial.* Thus, the question is not whether the defendant would more likely than not have received a different verdict with the concealed evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Smith v. Holtz*, 210 F.3d 186, 196 (3d Cir. 2000) (internal quotations, citations, and brackets omitted). The Supreme Court has further clarified that "strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999).

Plaintiff's *Brady* claim fails because, as noted above, he has not produced evidence demonstrating that Defendants improperly tampered with the photographs or that they did not provide the MICV recordings in a timely fashion to the prosecutor. Moreover, Plaintiff has not alleged that the information in question was not made available to him before trial. *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983) (holding that "[n]o denial of due process occurs if *Brady* material is disclosed . . . in time for its effective use at trial" (citation omitted)). To the contrary, it appears that Plaintiff had access to the original photographs, the MICV recordings, and the

laboratory results for trial. In addition, Plaintiff's *Brady* claim also fails because he was acquitted at trial. *See, e.g., Leone v. Twp. of Deptford*, 616 F. Supp. 2d 527, 534 (D.N.J. 2009) (finding that plaintiffs had "no standing to bring a due process claim based on defendants' alleged interference with evidence material to their cases" because "all charges were dropped against them, and their case never proceeded to trial"); *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999) ("Regardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial."); *Flores v. Satz*, 137 F.3d 1275, 1278 (11th Cir. 1998) ("Plaintiff, however, was never convicted and, therefore, did not suffer the effects of an unfair trial" and therefore the actions "do not implicate the protections of *Brady*."); *Gagliardi v. Fisher*, 513 F. Supp. 2d 457, 491 (W.D. Pa. 2007) (finding that when a plaintiff "was never convicted of forgery or attempted theft by unlawful taking . . . . he cannot claim that the 'evidence' was material to his guilt or punishment" under *Brady*); *United States v. Wirtz*, 357 F. Supp. 2d 1164, 1171 (D. Minn. 2005) ("Because of the acquittal, the alleged *Brady* violation did not occur in the commercial airlines fraud trial."). Accordingly, Defendants are granted summary judgment on Count Five.

### d. Count Nine (*Monell* Liability Against the Borough)

Count Nine brings an action for "Supervisory Liability" and alleges, in part, that "Supervisor officers and a municipality are liable for their own negligence in failing to select, train, or supervise adequately their subordinates for their establishment [sic], directly or implicitly of an official policy or procedure that violates an individual's constitutional rights. . . . Plaintiff asserts his belief, that supervisors who chose men of no character, and believe the constitutional violations that will follow are to be expected, are culpable [sic]." FAC at 79-80. In his opposition, Plaintiff recognizes Count Nine as bringing "[s]upervisory [l]iability for failure to train against Englewood Cliffs under *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978) (Count Nine)." Pl. SJ Opp.

at 3. The Court accepts Plaintiff's interpretation and considers Count Nine accordingly pursuant to Section 1983.

While a municipality may be liable under Section 1983, it cannot be held liable under a theory of *respondeat superior*. *Monell*, 436 U.S. at 691. "A municipality may only be held liable under § 1983 if the plaintiff identifies a municipal 'policy' or 'custom' that was the 'moving force' behind the injury." *Jewell v. Ridley Twp.*, 497 F. App'x 182, 185 (3d Cir. 2012) (quoting *Monell*, 436 U.S. at 694). "In other words, the plaintiff must show that the municipality, through one of its policymakers, affirmatively proclaimed the policy, or acquiesced in the widespread custom, that caused the violation." *Noble v. City of Camden*, 112 F. Supp. 3d 208, 221 (D.N.J. 2015) (internal citation omitted). "A plaintiff may show the existence of a *policy* when a decision-maker with final authority issues an official proclamation, policy, or edict." *Id.* (emphasis added) (internal quotations and citations omitted). "[A *c]ustom* may be established by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law." *Id.* (emphasis added) (internal quotations and citations omitted).

Concerning appropriate training, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989) ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983."). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. . . . *Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary* to demonstrate

deliberate indifference for purposes of failure to train." *Thomas v. Cumberland Cty.*, 749 F.3d

217, 223 (3d Cir. 2014) (emphasis added) (internal quotations, citations, and brackets omitted).[11]

Additionally, a plaintiff must show that the unlawful policy or custom was the proximate

cause of the plaintiff's injuries. The United States Supreme Court has observed the following as

to proximate cause:

> As our § 1983 municipal liability jurisprudence illustrates, however,
> it is not enough for a § 1983 plaintiff merely to identify conduct
> properly attributable to the municipality. The plaintiff must also
> demonstrate that, through its deliberate conduct, the municipality
> was the 'moving force' behind the injury alleged. That is, a plaintiff
> must show that the municipal action was taken with the requisite
> degree of culpability and must demonstrate a direct causal link
> between the municipal action and the deprivation of federal rights.

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997); *see also Watson v.*

*Abington Twp.*, 478 F.3d 144, 156 (3d Cir. 2007); *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d

Cir. 1990). A police department may have an otherwise adequate policy or practice, or an

otherwise sufficient training program, but may nevertheless still fall constitutionally short if it fails

to recognize the deficiencies of a particular officer. As noted, the department or its superiors are

generally charged with notice of an individual officer's shortcomings based on the officer's

"pattern of similar constitutional violations[.]" *Thomas*, 749 F.3d at 223.

Plaintiff fails to address any of Defendants' arguments in its opposition. Plaintiff does not

provide any information about any alleged policy or custom that caused Plaintiff's alleged false

---

[11] "[I]n certain situations, the need for training can be said to be so obvious, that failure to do so
could properly be characterized as 'deliberate indifference' to constitutional rights even without
a pattern of constitutional violations." *Thomas*, 749 F.3d at 223 (internal quotations omitted)
(citing *Canton*, 489 U.S. at 390 n.10). These "single-incident" failure to train cases are,
however, rare. "Liability in single-incident cases depends on the likelihood that the situation will
recur and the predictability that an officer lacking specific tools to handle that situation will
violate citizens' rights." *Thomas*, 749 F.3d at 223–24 (internal quotation, citation, and bracket
omitted). Here, Plaintiff has not argued the "single-incident" theory of liability.

arrest, or any other constitutional violation. Because Plaintiff fails to raise a genuine issue of material fact, Defendant Englewood Cliffs is granted summary judgment on Count Nine.

### e. Count Ten (Supervisory Liability Against Defendant Cioffi)

Count Ten brings a claim for "[s]upervisory [l]iability as is/was relevant to other charges to all parties names [sic] as Defendants in the McMorrow Lawsuit (referring to Deputy Police Chief McMorrow lawsuit filled [sic] against Police Chief Michael Cioffi), and all others named in that suit, and any parties not yet known in that complaint." FAC at 80. In his opposition, Plaintiff interprets his claim as bringing "[s]upervisory [l]iability against Chief Cioffi (Count Ten)." Pl. SJ Opp. at 3. The Court accepts Plaintiff's interpretation and considers Plaintiff's claims pursuant to Section 1983.

Plaintiff fails to include any legal arguments in opposition. However, Plaintiff does detail some facts surrounding Defendant Cioffi's involvement in Plaintiff's criminal case in the "Factual Background" section of his opposition. Plaintiff states that the police department "committed so many constitutional violations in connection with Plaintiff's arrest and prosecution for political reasons." Pl. SJ Opp. at 42. Plaintiff namely alleges that "[w]hen Plaintiff was arrested in 2011, Chief Cioffi saw an opportunity to leverage his arrest for a disturbing offense as an excuse to increase the size of the police force" and "accomplished this by directing his officers to continue the investigation of Plaintiff without probable cause and by publicizing his case in the press." *Id.* at 43.

There are two theories of supervisory liability that may be applicable to Defendant Cioffi. These theories are distinct from *respondeat superior* liability because "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Argueta v. U.S. Immigration & Customs Enf't*, 643 F.3d 60, 71 (3d Cir.

2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Accordingly, a plaintiff must show that "each Government-official defendant, through the official's own individual actions, has violated the constitution." *Id.* (quoting *Iqbal*, 556 U.S. at 676).

The first theory of supervisory liability examines whether Defendant Cioffi acted as a policymaker. "Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (internal quotation omitted). "This standard . . . specifically requires (1) deliberate indifference and (2) direct causation." *Jankowski v. Lellock*, 649 F. App'x 184, 187 (3d Cir. 2016) (citation omitted).

The second theory of supervisory liability that may be applicable to Defendant Cioffi "provides that a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K.*, 372 F.3d at 586. "Proximate causation is established where the supervisor gave directions that the supervisor knew or should reasonably have known would cause others to deprive the plaintiff of her constitutional rights." *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010) (internal quotation omitted). In other words,

> [A] plaintiff asserting a failure to supervise claim must not only identify a specific supervisory practice that the defendant failed to employ, he or she must also allege both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval.

*Jankowski*, 649 F. App'x at 187 (citation omitted).[12]

Here, Plaintiff fails to raise any genuine issues of material fact regarding Defendant Cioffi's involvement in any unconstitutional conduct. Far from showing any "deliberate indifference," Plaintiff fails to show that there was *any* violations of his constitutional rights. Plaintiff also presents no evidence of a policy, practice, or custom, as noted above. The Court has already determined that Defendants possessed the requisite probable cause to detain, arrest, and prosecute Plaintiff, that there is no actionable *Brady* violation, and that all of Plaintiff's other constitutional claims fail as a matter of law.[13] Accordingly, Plaintiff's supervisory claim against Defendant Cioffi fails and Cioffi is granted summary judgment on Count Ten.

## V. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment (D.E. 66) is **GRANTED**. Because the Court grants Defendants' motions for summary judgment on all counts, Defendants' outstanding motion (D.E. 65) regarding Plaintiff's expert is dismissed as moot. An appropriate Order accompanies this Opinion.

Date: April 12, 2018

John Michael Vazquez, U.S.D.J.

---

[12] The Third Circuit has "refrained from answering the question of whether *Iqbal* eliminated—or at least narrowed the scope of—supervisory liability because it was ultimately unnecessary to do so in order to dispose of the appeal then before us." *Jankowski*, 649 F. App'x at 187 (quoting *Argueta*, 643 F.3d at 70).

[13] Additionally, the department's press release had an explicit statement that "[a]ll defendants are presumed innocent until proven guilty beyond a reasonable doubt." D.E. 66-7, Ex. U ("Cioffi Press Release"). Defendant Cioffi's interview with the press resulted in an ill-advised comment concerning the potential paper towel evidence. Instead, Cioffi could have merely indicated that there was potentially additional evidence (without identifying the specific evidence) but that additional testing was needed.